**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————

MARTIN SHKRELI

          Plaintiff,

     v.

STEPHEN ASELAGE, MARGARET
VALEUR-JENSEN, AND GARY
LYONS

          Defendants.

————————————————

Civil Action
No.

**<u>COMPLAINT</u>**
**Jury Trial Demanded**

Martin Shkreli, through his undersigned counsel, files this Complaint against Stephen Aselage, Margaret Valeur-Jensen, and Gary Lyons for fraud and aiding and abetting fraud.

After starting a biopharmaceutical company from scratch and turning it into a successful enterprise worth hundreds of millions of dollars, Mr. Shkreli was unceremoniously and illegally ousted from the company at the hands of Defendants. Defendants, who had little to do with the success of the company but were instead driven by their egos, jealousy, and greed, were successful in only one thing: creating and carrying out a scheme to oust Mr. Shkreli from the company for their selfish benefit.  Indeed, the only people who benefitted from Mr. Shkreli's ouster were the three Defendants and a few other people they recruited.  Despite the company's commercial success, its vision that was Mr. Shkreli's is gone. The company is worse off now than it would have been had Mr. Shkreli remained as the leader of the company, as evidenced by the company's continuing

to feed off the assets created and acquired by Mr. Shkreli during his tenure, including RE-021 (Sparsentan), RE-024, Thiola®, Cholbam®, and Chenodal®.

Defendants' unlawful scheme involved ousting Mr. Shkreli from the company in violation of Mr. Shkreli's employment agreement, followed by fraudulently inducing him to negotiate in "good faith" the terms of his departure from the company, only to trick him into signing a fraudulent document, "resigning voluntarily" from the company for no consideration, and giving up his rights as the CEO and founder of the company. Defendants carried out the scheme without the authority of the company.  Defendants' fraudulent conduct was not authorized by the board. Defendants, Aselage and Valeur-Jensen in particular, made millions of dollars by successfully carrying out their illegal scheme and reaping what Mr. Shkreli sowed.

After successfully ousting Mr. Shkreli from the company, Defendants generously paid themselves millions of dollars – over $30 million to Mr. Aselage and over $5 million to Ms. Valeur-Jensen – all using the assets of the company created under Mr. Shkreli's leadership.  Having fully funded his retirement with the illegal ouster, Mr. Aselage has since retired with an extraordinary retirement package and is ready to wash his hands of the company.  Before he does, however, both Mr. Aselage and his co-Defendants Mr. Lyons and Ms. Valeur-Jensen must face the consequences of their actions and compensate Mr. Shkreli for the damage they caused.

## **Parties**

1.      Martin Shkreli is an adult individual who is domiciled in New York, New York.

2.     Stephen Aselage is an adult individual who resides in Rancho Santa Fe, California.

3.     Margaret Valeur-Jensen is an adult individual who resides in Del Mar, California.

4.     Gary Lyons is an adult individual who resides in Del Mar, California. Aselage, Valeur-Jensen, and Lyons are referred to collectively as "Defendants."

## Jurisdiction and Venue

5.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as Mr. Shkreli seeks damages in this civil action in excess of $75,000 and complete diversity of citizenship exists between Mr. Shkreli and Defendants.

6.     Personal jurisdiction over Defendants is proper in this Court because the events giving rise to the matter in controversy, as well as the harm suffered by Mr. Shkreli, a New York resident, occurred in New York.

7.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) since a substantial part of the events and omissions giving rise to Mr. Shkreli's claims occurred in this district.  During much of the relevant time complained of in this Complaint, the company operated out of New York, New York. Mr. Shkreli's ouster was in New York.

## Factual Background

8.     In late 2010, Mr. Shkreli began creating a start-up biopharmaceutical company aimed at developing orphan pharmaceutical drugs to treat and cure rare diseases often ignored by large pharmaceutical companies. Mr. Shkreli was particularly moved after learning about a young teenage boy who died from Duchenne Muscular Dystrophy (DMD).

3

DMD is a rare genetic disease that causes significant progressive muscle degeneration and weakness. It is caused by the absence of dystrophin, the protein that keeps muscle cells intact. As a testament to his commitment to DMD and other neglected rare diseases (often called "orphan diseases"), Mr. Shkreli called this new company he created Retrophin, a portmanteau of "Re(place) (dys)trophin."

9.      In early 2011, Mr. Shkreli formed Retrophin LLC.

10.     Mr. Shkreli signed an employment agreement dated March 1, 2011 with Retrophin LLC to serve as its CEO. Mr. Shkreli was 27 years old.

11.     In the Fall of 2011, Mr. Shkreli decided he wanted to take Retrophin LLC public. Mr. Shkreli believed Retrophin LLC had a better chance of success as a public company. Mr. Shkreli, with the help of his colleagues and corporate counsel, started identifying viable options to take Retrophin LLC public.

12.     Throughout 2011 and 2012, Mr. Shkreli and a core group of several individuals worked, largely without pay, on acquiring both assets and financing for Retrophin LLC, as well as taking it public.

13.     During this time, Mr. Shkreli continued to research diseases like DMD, where a single gene or protein is missing, and identify possible treatment options.

14.     Under Mr. Shkreli's leadership, Retrophin LLC, even in its infancy, made impressive strides.

**February 2012: Retrophin Enters into Licensing Agreement for Sparsentan**

15.      In February 2012, Mr. Shkreli's research paid off and he identified a unique opportunity for Retrophin to begin its mission to cure rare genetic diseases.

4

16.     In February 2012, Ligand Pharmaceuticals, Inc. entered into a worldwide licensing agreement with Retrophin LLC for the rights to DARA (a Dual Acting Receptor Antagonist of Angiotensin and Endothelin receptors) (PS433540), which Retrophin relabeled as Sparsentan (RE-021).

17.     Sparsentan was originally developed to treat hypertension, but Mr. Shkreli believed that its ability to filter excess protein from urine could make it useful in treating rare kidney diseases (nephropathies).

18.     Mr. Shkreli was right.

19.     Mr. Shkreli planned to develop Sparsentan for orphan indications of severe kidney diseases, including Focal Segmental Glomerulosclerosis (FSGS), a rare disease which attacks the kidneys' filtration system and leads to progressive scarring of the kidneys and renal failure, and for which there were no approved treatment therapies in the United States.

20.     Mr. Shkreli stated: "An estimated 50,000 patients in the United States are afflicted with FSGS and DARA has the potential to make a meaningful difference in their lives. DARA may help patients who are at high risk of losing their kidneys to their diseases by delaying the progression and reversing severe markers of kidney damage such as proteinuria. We will work to advance DARA into a pivotal trial as quickly as possible, as these desperate patients currently have few treatment options available to them."

21.     Around this time, Shkreli approached Dr. Howard Trachtman, a professor of clinical pediatrics at NYU Langone Medical Center and one of the nation's best-known FSGS specialists and told him of his idea.

22.     Dr. Trachtman stated: "I was thrilled, because historically FSGS has been a somewhat neglected entity…. Biotech companies have been unwilling to take the risk, because it's a rare disease. Martin is different."

23.     Dr. Trachtman also stated: "It's really remarkable that they're [Retrophin] willing to look at FSGS as their first test. But I can speak to personal experience with other drug companies where they have been gunshy about venturing into this disease. It's hard to succeed and we need new ideas and I think that's pretty impressive."

**April 2012: Retrophin Begins Developing a Treatment for PKAN**

24.     On or before April 2012, Mr. Shkreli, together with Dr. Andrew Vaino and Marek Biestek, began developing a treatment and drug designed to treat pantothenate kinase-associated neurodegeneration (PKAN), a life-threatening neurological disorder that typically begins in early childhood (on average, by age 3, and almost always before age 6) and is characterized by a build-up of iron in the brain which leads to degeneration of the nervous system, many Parkinsonian symptoms, and is followed by death within 10 years of diagnosis.

25.     Even before death, children with PKAN often require a wheelchair as they gradually lose the ability to move or walk. In many cases, these children also lose the ability to chew or swallow.

26.     Mr. Shkreli, Dr. Vaino, and Mr. Biestek successfully developed Fosmetpantotenate (RE-024) for treating this neurological disorder.

27.     The therapeutic concept of RE-024 was uniquely Mr. Shkreli's. Previously, no one had hypothesized that replacing phosphopantothenate with a prodrug could be

beneficial in PKAN. Mr. Shkreli invented new assays for PKAN and wrote protocols for and conducted preclinical experiments for RE-024, the success of which would directly lead to raising funding for Retrophin.

28.     A few months later, in July 2012, Retrophin LLC and St. Jude Children's Research Hospital entered into a sponsored research agreement aimed at developing a treatment for PKAN.

29.     Eventually, between 2013 and 2015, four U.S. Letters Patent Nos. 9,896,464, 9,629,862, 9,181,286, and 8,673,883 were issued to Retrophin, Inc. relating to the treatment and drugs for treating this neurological disorder.  Mr. Shkreli, Dr. Vaino, and Mr. Biestek are the inventors for the treatment and drugs under the four patents.

### May 2012 – December 2012: Retrophin Prepares to Go Public and Announces Stephen Aselage as CEO

30.     In May 2012, Mr. Shkreli and his then hedge fund, MSMB Capital, raised a $4 million Series A financing round for Retrophin LLC.

31.     Around this time, Mr. Shkreli began looking for a leader to serve as a CEO of Retrophin. Mr. Shkreli felt the company and the patients would benefit from someone with tremendous pharmaceutical executive leadership experience – someone who could (and would) take Retrophin to the next level.

32.     On August 23, 2012, Mr. Shkreli asked Stephen Aselage, who at the time was the Chief Business Officer and Executive President of BioMarin Pharmaceutical, Inc. to be the Chief Executive Officer of Retrophin LLC.

33.     To Mr. Shkreli, this was a "win-win" situation for both Retrophin and Mr. Aselage. Retrophin would be led by someone from one of the major players in the rare disease and orphan drug world, and Mr. Aselage would get to be CEO of a public company, something he had never done before, but wanted to do.

34.     Mr. Shkreli offered Mr. Aselage a $500,000 base salary with a 3-year term, including a target bonus of 50% of the base salary, as well as performance-based equity in the amount of 5% of the then outstanding shares at the strike price of the then valuation.

35.     Mr. Shkreli offered Mr. Aselage more money than he (Mr. Shkreli) was making from Retrophin.

36.     On or around September 12, 2012, Mr. Aselage accepted the position as CEO of Retrophin LLC, which became effective October 16, 2012, and was also named as a director on September 6, 2012. At that time, the other directors included Mr. Shkreli, Steven Richardson, and Edmund Sullivan. Mr. Sullivan left the Board on November 5, 2012.

37.     Mr. Shkreli was proud of his recruitment of Mr. Aselage. At the time, he told the press that Mr. Aselage was "good at things that I am not." Mr. Shkreli considered Mr. Aselage to be "politically savvy." Mr. Shkreli publicly complimented Mr. Aselage on his abilities to run a sales force and interact with the medical community.

38.     As a showing of his gratitude and appreciation, Mr. Shkreli personally gifted 50,000 of his shares in the company to Mr. Aselage, which, at the time, was exactly 5.0% of the company. After the reverse merger in December 2012, these shares converted 6-to-

1 so that Mr. Aselage received 300,000 shares from Mr. Shkreli. Today, that gift is worth around $6 million. At Retrophin's peak stock price, this gift was worth close to $11 million.

39.     On September 20, 2012, Retrophin, Inc. was formed and replaced Retrophin LLC as the corporate vehicle for the company. Going forward, unless otherwise stated, the term "Retrophin" shall mean Retrophin, Inc.

40.     On or around early October 2012, Mr. Shkreli's colleague identified a public shell company called Desert Gateway, Inc. Mr. Shkreli, with the help of his colleagues and corporate counsel, performed due diligence and determined Desert Gateway was suitable for Retrophin to merge into and become public.

41.     On or around late-November 2012 or early-December 2012, after Mr. Sullivan left the Board, Gary Lyons, at the request of Mr. Aselage, joined the Board of Retrophin. At this time, the other Board members were Martin Shkreli, Stephen Aselage, and Steven Richardson. Both Mr. Lyons and Mr. Aselage had significant experience with pharmaceutical companies.

42.     Mr. Shkreli met Mr. Richardson a few years before Mr. Shkreli formed Retrophin.  Mr. Richardson, a former high-ranking executive at American Express, acted as a mentor and friend to Mr. Shkreli and the two met regularly. Mr. Richardson wanted to be part of a long-term journey of creating drugs to cure rare disease with Mr. Shkreli. This is what Mr. Shkreli also wanted.

43.     As Mr. Shkreli learned after the fact, and a harbinger of things to come, in the weeks leading up to the reverse merger, and thereafter, Mr. Lyons, Mr. Aselage, and Ms. Valeur-Jensen were communicating with one another and expressing significant

criticism of Mr. Shkreli and Retrophin. This was during Mr. Aselage's time as both CEO and a director of Retrophin. Mr. Aselage never disclosed his true feelings about Mr. Shkreli to Mr. Shkreli as he was happy to accept the 50,000 Retrophin shares Mr. Shkreli gifted to him.

44.    AS CEO, Mr. Aselage had full authority over all aspects of the business and affairs of Retrophin. Despite his authority *and* duty, Mr. Aselage was often absent and even apologized for his absence. Mr. Aselage's absence necessitated Mr. Shkreli's involvement.

45.    Mr. Shkreli had no idea Defendants harbored ill-will towards him at the time. Instead, he believed Mr. Aselage and Mr. Lyons (he had not yet met Ms. Valeur-Jensen) genuinely wanted to help him, and more importantly, help Retrophin succeed. Mr. Aselage hid his antipathy toward Mr. Shkreli from him while superficially praising him for accomplishing new milestones he believed were not possible.

46.    Ms. Valeur-Jensen had no affiliation with Retrophin at this time. Ms. Valeur-Jensen knew Mr. Lyons from working together for more than a decade at Neurocrine Biosciences, Inc. Mr. Aselage also worked with Mr. Lyons at Genentech, Inc. Mr. Aselage and Ms. Valeur-Jensen met through Mr. Lyons in 2012.

### December 2012: Mr. Aselage Resigns as CEO of Retrophin Days Before Reverse Merger

47.    On December 9, 2012, just days before the reverse merger, after Retrophin was unable to secure the financing and pharmaceutical products it anticipated receiving for months, Mr. Aselage resigned as CEO of Retrophin at a time when the company needed strong leadership. He remained on the Board, however.

48.     Mr. Aselage resigned as CEO because he was not being paid his salary (since the company had about $5,000 in cash) and he anticipated the company's imminent demise. Mr. Aselage also did not feel he (Mr. Aselage) was in full control of the company. As CEO of the company, Mr. Aselage wanted complete control of Retrophin and blamed Mr. Shkreli for not giving him complete control of the company.

49.     Mr. Shkreli's influence, however, was inevitable and necessary as Mr. Aselage was in California while Mr. Shkreli and the rest of the operation was in New York. Further, Mr. Aselage did not show an interest in doing what it took for Retrophin to go public and succeed in its infancy. In other words, Mr. Aselage lacked the vision for Retrophin.

50.     Although Mr. Aselage was the CEO, Mr. Shkreli was the person pushing the company to succeed by, among others, recruiting talents and investors, exploring financing options and acquisition opportunities, and researching and developing drugs.

51.     During all of this, as Mr. Shkreli would later learn, Mr. Aselage engaged in a conflict of interest while he was CEO by diverting assets being targeted by Retrophin to another competing pharmaceutical company. These were the assets Retrophin was counting on having in its pipeline when it went public.

52.     Mr. Aselage argued his actions were lawful because in his view, after he resigned as CEO, he believed his noncompete with Retrophin was not legally enforceable since he had not received his salary (although he had received significant stock). On at least one occasion, Mr. Aselage discussed with a friend the terms under which it would be easier to work around Martin concerning this deal – a deal identified by Mr. Shkreli. He discussed

11

as much with Mr. Lyons, who encouraged Mr. Aselage to go for "round two." In this context, "round two" meant Mr. Aselage's attempt to go after the deal Mr. Shkreli identified for Retrophin. Mr. Lyons supported this.

53.     Despite his resignation and disloyalty to Retrophin, whose Board he sat on, Mr. Aselage kept the shares Mr. Shkreli gifted to him just two months earlier. These shares would lead to Mr. Aselage amassing a significant amount of wealth – because of Mr. Shkreli and his generosity and, more importantly, his belief in Retrophin and Mr. Aselage.

54.     Faced with no other options after Mr. Aselage's resignation, Mr. Shkreli became the new CEO of Retrophin.

55.     On December 12, 2012, with Mr. Shkreli as its CEO, Retrophin completed a reverse merger with Desert Gateway, Inc. Retrophin became a publicly traded company trading under the ticker symbol "RTRX" on the Over-the-Counter (OTC) markets.

56.     On December 14, 2012, Mr. Lyons gave Mr. Aselage his resignation from the Board of Retrophin, even though Mr. Shkreli was now the CEO. Mr. Lyons did not tell Mr. Shkreli or Mr. Richardson he resigned, even though he was resigning from the board of a public company. Mr. Lyons never issued a written statement to the Board or the shareholders.

57.     On December 17, 2012, Mr. Aselage also resigned from the Board of Retrophin.

58.     Mr. Aselage told his friends that he was "so glad to be out."

59.     Despite this sentiment, just a few weeks later, Mr. Aselage agreed with Mr. Shkreli that it made sense for Mr. Aselage to remain on the Board, and so Mr. Aselage

rescinded his resignation from the Board and rejoined the Board of Retrophin. Mr. Shkreli, despite his disappointment in Mr. Aselage based on Mr. Aselage's earlier behavior, accepted Mr. Aselage's proposal as he still believed Mr. Aselage could add value to the company, now public, in its early developmental years.

60.    During this entire time in 2011 and 2012, Mr. Shkreli went largely without pay and as such, lived at home with his parents in Brooklyn. Mr. Shkreli became the CEO of a public company at 29-years old while living at home with his parents.

61.    Without Mr. Shkreli, Retrophin would never have gone public.  While successfully going public was a great feat for Retrophin, with only $5,000 in cash on hand and significant payables, Retrophin's future existence was in serious question. Without the steps taken by Mr. Shkreli in 2013, Retrophin would not exist today.

### January 2013 – December 2013: Retrophin Experiences Significant Growth and Success in its First Year as a Public Company

62.    Throughout 2013, Retrophin, under Mr. Shkreli's leadership and direction, experienced significant growth and had many successes.

63.    Mr. Shkreli raised close to $35 million for the company in two private placements, both of which were critical to Retrophin's continued operation and survival, especially since Retrophin had no commercialized products at that time.

64.    Rather than support Mr. Shkreli in these bold endeavors, Mr. Aselage frequently expressed skepticism and doubt. Although Mr. Aselage told Mr. Shkreli he (Mr. Shkreli) would be unable to complete the private offerings, Mr. Shkreli, as a believer in Retrophin, knew he could and that he had no other choice for the company to survive. In

hindsight, Mr. Aselage's cynicism was an admission of both the doubt he felt towards Retrophin and the hatred and jealousy he carried towards Mr. Shkreli.

65.    Mr. Aselage, however, was the first to put out his hands after the private offering in February 2013 was successfully completed. Mr. Aselage, despite telling Mr. Lyons just two months earlier that he could directly compete with Retrophin while sitting on the Board of Retrophin, requested his unpaid salary from Mr. Shkreli, for a period where he was disloyal to Retrophin. Mr. Aselage made this request even though he resigned as CEO during the middle of the reverse merger, even though Retrophin could have failed without him, even though he was cynical of the private offering, and even though Mr. Shkreli had already generously gifted Mr. Aselage 300,000 shares.

66.    Despite Mr. Aselage's negativity and lack of help, in 2013, Retrophin's market capitalization grew from $30 million to more than $150 million. In 2013, the stock price of Retrophin doubled, trading as high as $8.50.

67.    The Board expanded from three members (Shkreli, Aselage, and Richardson) to five members with the appointments of Cornelius Golding and Jeffrey Paley.

68.    Mr. Shkreli also oversaw many significant hires in 2013, including Marc Panoff as the company's first Chief Financial Officer, Dr. Horacio Plotkin as the company's first Chief Medical Officer, and Maria Beconi as Vice President of Preclinical Development.

69.    Mr. Shkreli also ensured that Retrophin made significant strides in his true passion projects, the research and development of both Sparsentan (RE-021) and RE-024.

70.     Mr. Shkreli and Dr. Trachtman designed a Phase II DUET clinical trial of Sparsentan for the treatment of FSGS. This trial would go on to produce positive results in 2016 and to be a significant milestone in Retrophin's existence.

71.     In March 2013, Retrophin announced positive results from preclinical studies of RE-024 for PKAN. Mr. Shkreli stated: "We are delighted with the outcome of the experiments conducted by St. Jude Children's Research Hospital, which assessed RE-024 in a broad array of customized assays in PKAN …. The promising results we've seen to date are a testament to our chemistry team's design of RE-024. On the basis of these results, we are accelerating the timeline for filing of an IND for RE-024."

72.     In August 2013, Retrophin announced it received positive survival results from interim preclinical tests for RE-024. Mr. Shkreli stated: "We are proud of what we have accomplished with this program in a short period of time…When our team read about the plight of PKAN patients, we moved quickly to develop a series of phosphopantothenate analogs that we believed would rescue the phenotype of patients suffering from this horrific, catastrophic disease. Today I am so proud of our team for its dedication to these patients. We expect that we will be able to start a human study in first-quarter 2014."

73.     St. Jude Children's Research Hospital, Retrophin's partner, stated that it was "encouraged by the results of this most recent experiment with RE-024. The positive preclinical survival data generated by this study serve to further confirm our own proof-of-concept research, conducted earlier this year, pointing to RE-024 as a potential promising new approach to treating this debilitating and life-threatening disease."

74.    During all these successes, and despite the fiduciary duties he owed to Retrophin, Mr. Aselage frequently told his friends in the pharmaceutical industry that he was not a very active Board member, and even that he was just "farting around at Retrophin" and "not really spending any serious time on them."

75.    At one point, in the summer of 2013, Mr. Aselage indicated that he might leave Retrophin. It was clear, at this point, Mr. Aselage was looking for one final stop before his ultimate retirement and that Retrophin, with Mr. Shkreli in control and no commercial assets, was not going to be it.

76.    Even though he was a board member of a public company, Mr. Aselage readily admitted to his friend during this time that he was not an active board member.

77.    In the meantime, while Mr. Aselage was admittedly doing nothing, the success and aggressive growth of Retrophin, under Mr. Shkreli, continued in 2014.

**January 2014 – May 2014: Retrophin Acquires Three Commercial Products**

*Acquisition of Manchester Pharmaceuticals® LLC*

78.    On February 12, 2014, Retrophin announced it would be acquiring Manchester Pharmaceuticals® LLC ("Manchester"), a privately-held specialty pharmaceutical company with a mission similar to that of Retrophin – developing treatments for rare diseases.

79.    As a result of this announcement, the trading price of Retrophin stock skyrocketed from $10.68 to $19.47 in just one week.

80.     Retrophin agreed to pay Manchester a total of $62.5 million, with $29.5 million upfront. This would not have been possible but for the private offerings Mr. Shkreli arranged in February and August 2013, the ones Mr. Aselage doubted.

81.     As a result of this acquisition, which was completed on March 27, 2014, Retrophin acquired two FDA-approved drugs, Chenodal® (CDCA) (chenodeoxycholic acid – a synthetic bile acid also known as chenodiol) and Vecamyl® (mecamylamine HCI tablets).

82.     Chenodal® was indicated to treat and dissolve certain types of gallstones but had been withdrawn due to poor sales. Vecamyl® was indicated for the management of moderately severe to severe essential hypertension and uncomplicated cases of malignant hypertension.

83.     Retrophin's acquisition of Manchester was a transformative event for the company since it marked the first time Retrophin owned a commercial FDA-approved product. As a result of the Manchester acquisition, Retrophin began generating revenues.

84.     Mr. Shkreli knew that Chenodal® was also effective as a non-FDA-approved treatment for cerebrotendinous xanthomatosis ("CTX"), a rare, progressive, genetic lipid storage disease affecting bile acid metabolism that causes chronic diarrhea in infants, cataracts in childhood or adolescence, and ultimately, permanent neurological damage, including motor dysfunction and intellectual disabilities.

85.     In some cases, CTX is fatal. As other more effective treatments for gallstones were used, however, Chenodal® became increasingly unavailable, leaving people with

CTX without a treatment. Mr. Shkreli acquired Chenodal® so that Retrophin could seek FDA approval for the addition of the CTX indication to the Chenodal® label.

86.    At the time of the acquisition, Mr. Shkreli stated: "We are delighted to have the opportunity to help patients with CTX, an underdiagnosed and deadly disease … Almost all patients have avoidable permanent neurological damage underscoring the need for earlier diagnosis. We also intend to move quickly to pursue FDA approval of Chenodal for CTX."

87.    Dr. Gerald Salen, a physician at New Jersey Medical School with one of the largest CTX practices in the country, stated: "Chenodal® is the only effective treatment for CTX, a rare degenerative inherited disease, and therefore we are fortunate that Retrophin is continuing to make this FDA-approved drug available to patients."

88.    Retrophin partnered with Dohmen Life Science Services to assist patients newly diagnosed with CTX to navigate insurance coverage and other issues relating to obtaining a medicine that is designated as off-label.

*Retrophin Continues to Develop Sparsentan for FSGS and RE-024 for PKAN*

89.    In 2014, Retrophin began enrolling patients in the Phase II DUET clinical trial of Sparsentan for the treatment of FSGS that Mr. Shkreli helped design with Dr. Trachtman.

90.    On May 5, 2014, Retrophin received FDA Orphan Drug designation for RE-024.

91.    On May 12, 2014, Retrophin announced that RE-024 would be available to physicians throughout the world for the treatment of patients with PKAN under local

"compassionate use" regulations. The first patient was dosed that week – a personal triumph for Mr. Shkreli.

<u>Retrophin Acquires License for Thiola®</u>

92.     On May 29, 2014, Retrophin entered into a license agreement with Mission Pharmacal Company, a privately-held prescription medication and treatment provider, for the U.S. marketing rights for Thiola® (tiopronin), which is an FDA approved drug used to prevent the formation of kidney stones in patients with cystinuria, a rare genetic disease that can cause the loss of kidney function in addition to substantial pain and loss of productivity and for which there is no cure. Patients with cystinuria have an abnormally high concentration of cystine in their urine, which leads to the regular formation of stones in the kidneys, ureters, and bladder.

93.     Mr. Shkreli oversaw and worked closely with Retrophin's Business Development Team to perform due diligence on Thiola®.

94.     Mr. Shkreli stated:

Thiola adds another commercial product to our portfolio and is a strategic fit with our focus on rare diseases, particularly renal disease …. There are several causes of chronic kidney stones, and we believe cystinuria has been underdiagnosed. We will seek to build awareness of the disease and bring this effective treatment to more patients. Thiola marks Retrophin's first deployment of a salesforce, and the relationships we build with nephrologists will help as we prepare for the potential approval of sparsentan and RE-034. With the addition of this new product, we are increasing our financial guidance.

95.     A few months later, the license agreement was amended to give Retrophin the Canadian marketing rights to Thiola®.

96.     Mr. Shkreli predicted that Thiola® would become Retrophin's largest product. He was right.

### *Deal with Asklepion Pharmaceuticals, LLC*

97.     In early 2014, in response to an opportunity identified by Mr. Shkreli, Mr. Shkreli and the Business Development team of Retrophin began targeting Asklepion's cholic acid program to support his efforts to develop a treatment for CTX, a disease at the forefront of Mr. Shkreli's mind. Retrophin and Asklepion entered into a CDA while Mr. Shkreli was CEO. Mr. Shkreli approved the general terms of this deal while he was CEO.

98.     On January 12, 2015, Retrophin and Asklepion entered into an agreement under which Retrophin acquired the exclusive right to purchase cholic acid from Asklepion.

99.     In March 2015, after the FDA approved cholic acid, Retrophin exercised its option to buy Asklepion. As a result of this agreement, Asklepion also transferred a Rare Pediatric Disease Priority Review Voucher to Retrophin.

100.    Just a few months later, Retrophin sold the PRV for $245 million.

101.    In response to the sale of the voucher, Mr. Aselage stated: "Closing the sale of the voucher significantly strengthens our balance sheet….The additional cash and prepayment of our high-interest credit facility provide Retrophin with considerable operational flexibility to devote resources to the progression of our pipeline and the pursuit of additional rare disease assets."

102.    Although the deal was not consummated until after Mr. Shkreli was ousted from the company, the deal would not have happened but for Mr. Shkreli.

20

## January 2014 – September 2014: Retrophin Experiences
## Significant Financial Growth

103.    On January 7, 2014, Retrophin announced that it had commenced an offering to sell $40,000,000 of shares of its common stock (4,705,882 shares at $8.50 per share) in a public offering.

104.    On January 10, 2014, in connection with this $40 million initial public offering, Retrophin received an uplisting on NASDAQ and began trading on the NASDAQ Global Market (still under the ticker symbol "RTRX").

105.    On May 30, 2014, Retrophin completed a convertible debt offering, raising another $40 million in capital.

106.    At the same time, Retrophin closed a $45 million senior secured term loan facility, leaving Retrophin with $91 million in gross proceeds raised.

107.    As a result, Retrophin was able to pay its final payment of $33 million to the sellers of Manchester in full satisfaction of the amount outstanding.

108.    On August 25, 2014, Retrophin hired its one-hundredth employee. Notably, during Mr. Shkreli's tenure as CEO, there was almost no turnover in employees.

109.    By September 2014, Retrophin's market capitalization was around $350 million and its stock had touched $20 (with the peak price being $23.36), representing a 1,000% increase in value in less than two years.

**May 2014 – September 2014: After Retrophin's Proven Success under Mr. Shkreli, Mr. Aselage Becomes the Company's COO and Begins Planning to Oust Mr. Shkreli as CEO and Assume Control of the Company**

110.    After Retrophin proved to be a successful and viable company with commercial products and significant market capitalization, Mr. Aselage became interested in making one last stop before his ultimate retirement.

111.    To that end, and unbeknownst to Mr. Shkreli, beginning in May 2014, Mr. Aselage began planning to oust Mr. Shkreli as CEO of Retrophin and become CEO himself. On May 28, 2014, Mr. Aselage entered into an employment agreement with Retrophin under which he would serve as the Company's Chief Operations Officer (COO). Looking in hindsight, Mr. Aselage's becoming the COO was a surprising move given how he wanted to be the CEO of the company. Mr. Aselage did not want to answer to anyone – especially not to Mr. Shkreli – and that is why he resigned as the CEO in the first place: he did not feel he (Mr. Aselage) had complete control over Retrophin.

112.    Mr. Shkreli, however, was too busy managing Retrophin, having successfully closed on the critical deal with Manchester and about to close on a deal with Mission for Thiola®, to notice Mr. Aselage's true intentions, and, Mr. Aselage was good at hiding them. Further, Mr. Shkreli, a true optimist and believer, believed Mr. Aselage genuinely wanted to help the company grow and succeed. Mr. Shkreli believed everyone at Retrophin shared his passion for the company.

113.    In June 2014, Mr. Aselage recruited Ms. Valeur-Jensen to oversee and help carry out his plan to oust Mr. Shkreli. Ms. Valeur-Jensen was loyal to Mr. Aselage, not to Retrophin, and was willing to help Mr. Aselage.  Mr. Aselage, of course, did not tell Mr.

Shkreli the real reason he hired Ms. Valeur-Jensen. Rather, he told Mr. Shkreli he wanted

Ms. Valeur-Jensen to work for Retrophin as its General Counsel.

114.    Thereafter, Ms. Valeur-Jensen was brought on as a legal consultant. Mr.

Aselage and Ms. Valeur-Jensen were both in the California office, while Mr. Shkreli was

in the New York office. People associated with Retrophin, including employees, believed

Ms. Valeur-Jensen, who was very close with Mr. Aselage, cared more about protecting Mr.

Aselage, and vice versa, than either of them did about Retrophin, including its employees.

In other words, Mr. Aselage and Ms. Valeur-Jensen cared mostly about themselves, as is

evidenced by their actions and later self-awarded compensation.

115.    During this time, Ms. Valeur-Jensen repeatedly expressed her distaste for

how much Retrophin's outside counsel, Katten Muchin, was being paid by the company.

Overall, she did not care for people she identified as Mr. Shkreli's hires.

116.    After assuming the role as COO, Mr. Aselage began soliciting fellow Board

member, Steven Richardson, to participate in his plot to overthrow Mr. Shkreli as CEO.

117.    To successfully recruit Mr. Richardson, Mr. Aselage, with assistance from

Ms. Valeur-Jensen, led Mr. Richardson to believe Mr. Shkreli was not fit to lead Retrophin.

Mr. Aselage told Mr. Richardson, for instance, that Mr. Shkreli caused an over-issuance of

Retrophin's options to certain company employees.  Mr. Aselage knew the CFO (Mr.

Panoff) was in charge of the issuance of options to employees, and that HR, the Audit

Committee, and the Board at large were also responsible.  Although Mr. Richardson should

have also known that Mr. Shkreli had nothing to do with the over-issuance of options to

the employees, Mr. Aselage successfully convinced Mr. Richardson that Mr. Shkreli improperly issued options to certain employees that Mr. Shkreli favored.

118.   Angered about Mr. Shkreli's purported negligence (credit to Mr. Aselage's scheme), Mr. Richardson, who saw himself as a mentor to Mr. Shkreli, felt betrayed by Mr. Shkreli. This was particularly true because Mr. Richardson always felt as though, due to his early support and investments, he deserved 5% of Retrophin, which he did not have. Mr. Richardson wanted 5% interest in the company more so than ever – despite the company's adding additional investors since Mr. Richardson's investment – as Retrophin became a great success in the second half of 2013.

119.   Eventually, by early summer of 2014, Mr. Aselage succeeded in turning Mr. Richardson against Mr. Shkreli and supporting Mr. Aselage's rise at the company. Together, they plotted a plan to overthrow Mr. Shkreli at the end of the summer when they could get together in person in New York.

120.   In August or September 2014, Mr. Aselage also recruited Mr. Lyons to join his scheme to oust Mr. Shkreli from the company.  Given Mr. Lyons's existing hatred towards Mr. Shkreli, of which Mr. Aselage knew well, Mr. Lyons was the perfect candidate. To do so, Mr. Aselage invited Mr. Lyons to rejoin the Board of Retrophin.  In other words, Mr. Aselage invited Mr. Lyons to the Board as he (Mr. Aselage) was confident that he had (or would have) enough Director's votes to oust Mr. Shkreli.

121.   In August or September 2014, Mr. Aselage and Mr. Lyons were secretly discussing the terms of Mr. Lyons's re-joining the Board, including Mr. Shkreli's planned ouster from the company.

122.    Mr. Shkreli, of course, knew nothing of the secret plot and supported Mr. Lyons's joining the Board.  Mr. Shkreli believed Mr. Lyons genuinely wanted to help Retrophin succeed.

123.    Defendants were also planning to come up with "justification" for ousting Mr. Shkreli as Mr. Shkreli's employment agreement prohibited termination absent a final felony conviction.  Defendants knew the company would have to pay Mr. Shkreli a substantial sum of money, including all monies due under the employment agreement, in the event of termination in breach of the employment agreement.

124.    Defendants had no intention of allowing that to happen.

**September 29, 2014 – October 13, 2014: Mr. Aselage and Mr. Richardson**
**Unlawfully Remove Mr. Shkreli as CEO**

125.    On the afternoon of September 29, 2014, in a true "Et tu, Brute?" moment, particularly by Mr. Richardson, who Mr. Shkreli believed was his friend, Mr. Aselage and Mr. Richardson met with Mr. Shkreli in person, in his office, and without Board authorization, unlawfully terminated Mr. Shkreli as CEO.

126.    Mr. Richardson told Mr. Shkreli that he thought it was time for someone else to become the CEO of Retrophin. Mr. Richardson meant it was time for Mr. Aselage to become the CEO.

127.    Mr. Shkreli asked Mr. Aselage and Mr. Richardson whether they had spoken with Retrophin's shareholders about their apparent ousting. They responded that they did not and did not intend to.

128.    Mr. Aselage flew to New York from California (at the company's expense) just to fire Mr. Shkreli. Although not a director, Ms. Valeur-Jensen also flew to New York from California, at the company's expense, for the coup.

129.    Ms. Valeur-Jensen was elated by Mr. Aselage's and Mr. Richardson's unlawful actions, stating: "I am just sitting here laughing and imagining the look on Martin's face when somebody finally said FUCK YOU."

130.    Mr. Shkreli was stunned by Mr. Aselage and Mr. Richardson, especially at Mr. Richardson, for their unlawful conduct and Mr. Richardson's betrayal. In response to the coup, Mr. Shkreli told Mr. Richardson that he "will never be able to express [his] disappoint[ment] fully."

131.    Mr. Shkreli's Board-approved Employment Agreement dated December 16, 2013 only permitted Mr. Shkreli to be terminated for a "final conviction under United States federal or state laws for a felony or crime involving moral turpitude." Defendants knew about this provision when Mr. Shkreli was ousted.

132.    Mr. Shkreli knew he could not be terminated and told Mr. Aselage and Mr. Richardson as much just a few hours after the ouster: "I wanted to make sure you are 100% clear that I have not resigned, despite your request. I have looked over my EA and suggest you do the same. You hereby cannot reference any resignation in any press release – you may refer to it as a 'not for cause termination' if you elect to apply such an action."

133.    Mr. Richardson found Mr. Shkreli's lack of acquiescing to his and other Defendants' illegal actions "disappointing." While Mr. Shkreli's world crumbled, Mr. Richardson nonchalantly rallied Mr. Aselage.

134.     On September 30, 2014, without giving proper notice to Mr. Shkreli, and without shareholder consent, the Board (without Mr. Shkreli) convened a meeting at which it adopted resolutions *post hoc* "officially" removing Mr. Shkreli as CEO.

135.     Thereafter, Retrophin issued a press release through Business Wire in which it announced a "leadership organization" under which "the Board of Directors has appointed Stephen Aselage as interim Chief Executive Officer (CEO), effective immediately to replace Martin Shkreli, Founder and CEO."

136.     Both Mr. Richardson and Mr. Aselage gave statements as well.

137.     Mr. Shkreli was not consulted or informed before the press release by the Board at Mr. Aselage's direction and instruction.

138.     At the time of this press release, although the company, under Mr. Aselage's control, terminated Mr. Shkreli, Mr. Shkreli himself had not resigned as CEO.  Absent a felony conviction, Mr. Shkreli could only be removed as CEO by voluntary resignation.

139.     Likewise, Mr. Shkreli, still a member of the Board of Directors, did not agree to the appointment of Mr. Aselage as his replacement.

140.     At the same time, Bloomberg ran an article reporting that "people familiar with Retrophin" reported that Mr. Shkreli was "abruptly fired" for stock trading irregularities. Under Mr. Shkreli's employment agreement, however, which was approved by the Board, filed with the SEC and of public record, this would not be sufficient grounds for termination.

141.     Mr. Shkreli believes the "people familiar with Retrophin" refer to Defendants, and that Defendants were referring to an issue involving short swing profits which was resolved.

142.     At the time of the ouster, Retrophin, under Mr. Shkreli, was planning several highly accretive transactions which would have further increased the company's earnings per share. None of these transactions came to fruition.

143.     After the news of his ouster broke, Mr. Shkreli received many emails of support from Retrophin's investors and shareholders.

144.     One investor stated to Mr. Shkreli: "I can only imagine how you're feeling. I have tremendous respect (and appreciation) for your brilliance, vision, and for what your blood, sweat, and tears created. I hope we can stay in touch down the road. Depressing day."

145.     Another investor stated to Mr. Shkreli: "Sorry to see this. You have created a ton of value for this company. Although it has yet to be realized, I think that's just a matter of time…. Keep your head up, you did an incredible thing."

146.     Another investor sold all his Retrophin stock that same day and wrote to Mr. Shkreli: "Sold off all my holdings in Retrophin. I don't want to be around if you're not the boss."

147.     Many investors emailed Mr. Aselage and Mr. Richardson pleading with them to reconsider their actions.

148.     Defendants ignored these pleas from Retrophin's own investors and shareholders.

149.    The ouster of Mr. Shkreli, for personal reasons, and without just cause, robbed Retrophin's shareholders, including Mr. Shkreli, who was the largest shareholder at the time, of the benefits of the deals being pursued by Retrophin under Mr. Shkreli.

150.    Just one day after issuing a press release announcing Mr. Shkreli's purported termination, Mr. Richardson and Mr. Aselage wasted no time making sure Mr. Aselage was paid more money. To that effect, Mr. Richardson told the head of HR draft something for the Board to approve that would give Mr. Aselage financial recognition as CEO.

151.    Shortly after being unlawfully terminated by Retrophin, Mr. Shkreli threatened various lawsuits for the unlawful termination in violation of the Employment Agreement.

152.    Mr. Shkreli correctly reminded Ms. Valeur-Jensen, Mr. Richardson and Mr. Aselage that "[t]he last time Steve ran this Company, it was hurtling towards bankruptcy until I saved it."

153.    Mr. Shkreli explained to Retrophin employees that he "was busily creating shareholder value until the people [he] put into place to help [him] greedily attempted (and failed) to pull the rug out from under [him.]"

154.    Mr. Shkreli also threatened to start a proxy fight, which he felt he would win, particularly since neither Mr. Aselage nor Mr. Richardson ever discussed their anticipated action with Retrophin's shareholders – many of whom were very pleased with Mr. Shkreli and attributed the value of Retrophin almost solely to him.  Further, at the time of the ouster, Mr. Shkreli owned approximately 20% of the stock.

155.    On Monday, October 6, 2014, Mr. Shkreli told Defendants he would continue to function as CEO of the company. He told Mr. Aselage, Mr. Richardson, and Ms. Valeur-Jensen of his intentions in this regard.

156.    In response to Mr. Shkreli's plan to continue to serve as CEO, and in evidence of Mr. Lyons' palpable distaste for Mr. Shkreli, Mr. Lyons asked Mr. Aselage if he needed his Glock pistol to bring with him to the office. In response, Mr. Aselage indicated he had a Beretta.

157.    Soon thereafter, the company, at the direction of Defendants, locked Mr. Shkreli out of Retrophin's offices, changed the company's locks, and shut off his access to the company's systems, which left Mr. Shkreli unable to access any of his Retrophin or personal documents or files, or perform any of the duties of CEO.

158.    Defendants also began discussing who needed to be let go from the company. Defendants did not want "friends of Martin" to remain at Retrophin.

159.    Defendants were wary that more shareholders would side with Mr. Shkreli over them if there was a proxy fight.  Among Retrophin's shareholders, Mr. Shkreli was well regarded as a brilliant leader who almost single-handedly made the company a financial success.  That is, even if a shareholder liked Defendants over Mr. Shkreli on a personal level, he or she would have preferred to invest with Mr. Shkreli, not Defendants.

160.    Knowing the termination of Mr. Shkreli breached the Employment Agreement, Defendants devised a plan to have Mr. Shkreli "voluntarily" resign from the company to avoid an immediate lawsuit and proxy fight by Mr. Shkreli.

30

**Defendants Fraudulently Induce Mr. Shkreli to Negotiate a Settlement and Resign as CEO for No Consideration**

161.   To get a "voluntary resignation" and avoid a proxy fight or lawsuit, Defendants fraudulently induced Mr. Shkreli to enter into a Summary Separation Proposal (SSP) on October 13, 2014, under which Mr. Shkreli resigned from Retrophin. A copy of the SSP is attached hereto as **Exhibit "A."**

162.   The SSP was a letter of intent that contemplated a definitive agreement between Mr. Shkreli and Retrophin. Defendants, however, knew that Retrophin, at the direction of Defendants, would not honor its promises to Mr. Shkreli, including permitting the <u>continued vesting</u> of his options under a December 16, 2013 Non-Qualified Stock Option Agreement (the "2013 Award").

163.   Under the 2013 Award, the 1,080,000 shares of restricted stock vested in quarterly tranches each year, meaning Mr. Shkreli was entitled to 360,000 options under the SSP as post-termination severance, in addition to his pre-termination options under the Award, 270,000 of which had vested.

164.   Mr. Shkreli also had been awarded 400,000 performance-based options which were exercisable upon Retrophin achieving specifically described financial milestones (the "2014 Award").

165.   Having removed Mr. Shkreli from his position and authority as CEO, Defendants desperately needed to stop Mr. Shkreli from continuing to receive the benefits of that office to which he was entitled under his employment agreement, the 2013 Award and the 2014 Award. Defendants also needed to keep Mr. Shkreli from starting a proxy

fight or filing a lawsuit.  The SSP was the vehicle they chose to induce Mr. Shkreli to refrain from starting a proxy fight or filing lawsuits.

166.    During the two weeks the SSP was being "negotiated," Mr. Shkreli, still a director of Retrophin, voted for Gary Lyons to join the Board.

167.    On that same call, on October 8, 2014, when Mr. Shkreli voted for Mr. Lyons to join the Board, Mr. Shkreli told Mr. Lyons and the other directors to take care of the company for him. Mr. Lyons told Mr. Shkreli that he would and that "she's a beauty."

168.    Due to Defendants' deception, Mr. Shkreli did not know of Mr. Lyons's participation with Mr. Aselage and Ms. Valeur-Jensen in the plot against him and that Mr. Lyons was only joining the Board because he (Mr. Shkreli) was leaving.

169.    Although Mr. Lyons did not become a member of the Board until October 8, 2014, he participated in fraudulently inducing Shkreli to sign the SSP, as he reviewed drafts of the SSP and knew of the plan devised by Mr. Aselage and Ms. Valeur-Jensen (his longtime friends) to induce Mr. Shkreli to resign "voluntarily" for no consideration, and thereafter, rob him of his options.

170.    In the two weeks the SSP was being "negotiated," Mr. Aselage, then acting as the new CEO, announced an internal investigation into Mr. Shkreli, which he and Ms. Valeur-Jensen had planned before the ousting of Mr. Shkreli.

171.    Rather than focusing on any "unknown" activity of Mr. Shkreli, however, the investigation focused largely on past activity known and approved by the Board.  The investigation was a pre-text tool to justify the illegal termination of Mr. Shkreli in violation of the Employment Agreement.  In addition to its use as the "justification" for the

32

termination of Mr. Shkreli, the investigation was also being used as false leverage in negotiating the SSP.

172.    Surprisingly, Ms. Valeur-Jensen and Mr. Aselage elected to hire Cooley to spearhead the internal investigation. This was surprising because, despite her short tenure with the company, Ms. Valeur-Jensen was "outraged" by Katten's bills, which were comprised first and foremost by work related to sophisticated acquisitions, such as the Manchester and Thiola® acquisitions. Cooley's rates are comparable to (if not higher than) Katten's.

173.    While negotiating the SSP directly with Mr. Shkreli, Mr. Aselage told Mr. Shkreli that Retrophin was unwilling to agree to mutual releases because the company wanted protection from "the unknown." Mr. Aselage concealed from Mr. Shkreli that there was already an investigation underway into known, Board-approved items.

174.    During this time, Mr. Aselage and Ms. Valeur-Jensen both discussed "going to war" with Mr. Shkreli and that they saw a "real fight" coming. Mr. Shkreli, however, did not want a war. Mr. Shkreli told both Mr. Aselage and Mr. Richardson this. Mr. Shkreli specifically stated that "[a] war would be bad."

175.    In other words, while ostensibly negotiating the terms of Mr. Shkreli's separation in "good faith," Defendants were, once again, secretly plotting to deprive Mr. Shkreli of any rights he would have under the Employment Agreement, the 2013 Award, and the 2014 Award.

176.    Mr. Shkreli did not know there was an investigation of the sort and degree until it was publicly reported months later in Retrophin's February 19, 2015 Form 8-K, just four months after he resigned from the Company.

177.    No provision of the SSP states that Retrophin's payment of severance and other benefits would be contingent on any ongoing or later investigation into Mr. Shkreli's performance as CEO and a director of Retrophin.

178.    In signing the SSP and documenting his "resignation," Mr. Shkreli and Mr. Aselage often spoke directly. Mr. Shkreli relied on Mr. Aselage's promises that he (Mr. Shkreli) would, among other things, be afforded the continued vesting of stock options under his Employment Agreement and the 2013 Award.

179.    Without these promises, Mr. Shkreli, under the terms of the SSP, would otherwise have no reason to concede, not file suit, and "resign."

180.    Defendants were aware of Mr. Shkreli's reliance on the promises made, as reflected in the SSP, as Mr. Shkreli stated in writing to Mr. Aselage that he could not resign without having some kind of "enforceable benefit" for doing so.

181.    Defendants were also well aware that Mr. Shkreli "expect[ed] some amount of restricted stock/options to vest."

182.    Despite such, not only did Defendants fraudulently induce Mr. Shkreli into signing the SSP, but they also presented Mr. Shkreli with a version of the SSP for his signature that did not reflect the parties' agreement, thus committing *fraud in the factum*.

**Defendants Provide Mr. Shkreli with a Materially Altered Version of the
SSP for Signature and Falsely Represent to Mr. Shkreli that the Document
<u>Reflects the Parties' Negotiations and Agreement</u>**

183.    On October 12, 2014, after various versions of the SSP had been exchanged
between Mr. Shkreli and Defendants, Mr. Aselage sent Mr. Shkreli a redline copy of the
SSP and stated: "Rewrite of the release component and sale of stock component attached.
Feedback welcome. It's awkward to try to put into words."

184.    The opening paragraph of the draft of the SSP Mr. Aselage sent to Mr.
Shkreli stated:

> The following sets forth the principal terms of the proposed
> separation proposal involving the resignation by Martin
> Shkreli from the position of Chief Executive Officer and
> Director of Retrophin, Inc. (the "Term Sheet"). The Parties
> acknowledge and agree that, except as is expressly set forth
> herein, *this proposal and all discussions in connection
> herewith are non-binding* and there are no legally binding
> obligations between Retrophin, Inc. and Mr. Shkreli relating to
> the proposal or the entry into a definitive agreement, whether
> set out herein or otherwise, setting forth these terms. The terms
> of this proposal are confidential. <u>The parties will work together
> in good faith to execute the transactions contemplated by this
> agreement.</u>

 (Emphasis in *Italics* added).

185.    The underlined sentence was sent to Mr. Shkreli in redline form. Mr. Shkreli
sent back his comments to Mr. Aselage in the body of an email, rather than as another
redline draft attachment, and Mr. Shkreli and Mr. Aselage exchanged a few more emails,
mostly relating to indemnification.

186.    Mr. Aselage did not send Mr. Shkreli a copy of the SSP before it was presented to, and approved by, the Board. Likewise, Mr. Aselage did not send Mr. Shkreli any more drafts of the SSP.

187.    Rather, on October 13, 2014, Mr. Aselage sent Mr. Shkreli an email at 3:31 p.m. that stated: "Attached is the LOI. Board has approved it. I don't think there are any surprises but take a look. If you're good with it, please sign and pdf it back. We'll sign and get moving on finalizing a press release." Mr. Aselage attached a final, clean copy of the SSP that did not reflect any redline changes.

188.    While representing that there are no "surprises" in the SSP, Mr. Aselage did not explain what changes he made to the SSP.

189.    Mr. Shkreli, believing the SSP was as the parties had negotiated and agreed to, without consulting with his lawyers, sent the signed SSP back one hour later.  Mr. Shkreli, as of October 2014, had no reason to believe his termination from the company was a result of Mr. Aselage's secret plot that began many months earlier.  In other words, Mr. Shkreli had no reason to believe Mr. Aselage was lying to Mr. Shkreli when he (Mr. Aselage) said, "I don't think there are any surprises but take a look."

190.    In fact, however, the SSP that Mr. Aselage told Mr. Shkreli was as the parties agreed to was materially altered.

191.    Notably, the first paragraph of the SSP the parties signed states:

> The following sets forth the principal terms of the proposed separation proposal involving the resignation by Martin Shkreli as an employee and officer and Director of Retrophin, Inc. (the "Term Sheet"). The Parties acknowledge and agree that, **except for Mr. Shkreli's resignations as expressly set**

**forth herein (which resignations are binding and irrevocable)**, this proposal and all discussions in connection herewith are non-binding and there are no legally binding obligations between Retrophin, Inc. and Mr. Shkreli relating to the proposal or the entry into a definitive agreement, whether set out herein or otherwise, setting for these terms. The terms of this proposal are confidential. The parties will work together in good faith to execute the transactions contemplated by this agreement.

 (Emphasis added).

192.    Mr. Aselage's email communication to Mr. Shkreli did not reflect this material change that is underlined and bolded above.  Rather, Mr. Aselage led Mr. Shkreli to believe the SSP he sent to Mr. Shkreli was the same or substantially similar version Mr. Aselage and Mr. Shkreli shared right before the altered version.

193.    In yet another betrayal, Mr. Aselage and Defendants committed one final act of fraud against Mr. Shkreli by having him sign a version of the SSP that reflected exactly what they wanted – getting Mr. Shkreli to resign for no consideration.  While the SSP stated that it was not binding until the parties entered into a definitive agreement (the same language contained in all earlier versions of the SSP), Mr. Aselage and Defendants surreptitiously added the language stating that Mr. Shkreli's resignation would be the only binding portion of the SSP.

194.    Mr. Shkreli, believing that Mr. Aselage would negotiate in good faith, did not believe Mr. Aselage would dupe him. As such, Mr. Shkreli signed this version of the SSP without even sending it to his lawyers first, believing there were no material changes, as Mr. Aselage had represented.

195. Ms. Valeur-Jensen, as the lawyer drafting the SSP, induced a material error in the SSP, which is an ethical violation in California (where she is licensed).

196. Plaintiff believes Mr. Richardson did not know about Defendants' bait-and-switch in the SSP.

**October 13, 2014 – February 19, 2015: Mr. Aselage and Ms. Valeur-Jensen
Continue to Carry out their Fraud Against Mr. Shkreli by Hiding
their Intent to Dishonor the SSP while Forcing Mr. Shkreli, on Behalf of
Turing Pharmaceuticals, to Enter into Asset Purchase Agreements for
Products Retrophin No Longer Wanted**

197. After the SSP was executed, through February 19, 2015, Mr. Shkreli continued to communicate with both Mr. Aselage and Ms. Valeur-Jensen, who on November 19, 2014, became General Counsel of Retrophin. During this time, Retrophin induced Mr. Shkreli's reliance on the SSP.

198. For example, on October 15, 2014, Mr. Aselage told Mr. Shkreli that he needed to abide by the LOI regarding current Retrophin employees unless he received a waiver from the company.

199. On November 14, 2014, Ms. Valeur-Jensen asked Mr. Shkreli whether Retrophin could advise investors that Shkreli would hold 75% of Retrophin stock referenced in a provision of the SSP. As such, Defendants, and Retrophin, actively encouraged Mr. Shkreli's reliance on the SSP, and even his performance, even though Defendants never intended to perform concerning Mr. Shkreli.

200. Despite not having any noncompete obligations, Mr. Shkreli acted in good faith by checking with Retrophin and Mr. Aselage before pursuing certain business opportunities with the new company he started after the ouster, Turing Pharmaceuticals.

For example, on December 11, 2014, Mr. Shkreli sought Retrophin's permission to pursue treatments for Lafora and SLO Syndrome.

201.    Throughout this period, Mr. Shkreli attempted to discuss his stock options several times and to seek clarity on the terms of the SSP.

202.    On each occasion, and as further evidence of the fraud, Mr. Aselage and Ms. Valeur-Jensen either directly ignored Mr. Shkreli's requests or provided cryptic and unclear responses to intentionally mislead Mr. Shkreli and continue to conceal Retrophin's plan to refuse to honor the SSP, and provide Mr. Shkreli with both his pre- and post-termination options under a definitive agreement, all the while pressuring Mr. Shkreli, as the CEO of Turing, to close on the asset purchase agreements contemplated between Turing and Retrophin under the SSP, which he did.

203.    Things came to a head in February 2015 when Ms. Valeur-Jensen and Mr. Aselage insisted that the asset purchase agreements between Retrophin and Turing close immediately. Mr. Shkreli was fine with closing but wanted a definitive agreement relating to the consideration owed to him by Retrophin. Ms. Valeur-Jensen and Mr. Aselage insisted there was not time for a definitive agreement between Mr. Shkreli and Retrophin to be executed and accused Mr. Shkreli of trying to purposely renege on his obligations.

204.    In fact, Mr. Aselage even directly represented to Mr. Shkreli that the terms of the SSP are "valid and binding" and that Mr. Shkreli was kidding himself if he thought otherwise.

205.    Later correspondence in May 2015 from Retrophin's counsel to Mr. Shkreli's counsel shows that as of February 2015, Retrophin had no intention of allowing Mr. Shkreli to receive either his pre- or post-termination options.

206.    To that end, Defendants took a self-serving position that Mr. Shkreli had to exercise his pre-termination options by November 13, 2014, despite explicit language to the contrary in the SSP. Having arguably removed any power Mr. Shkreli would otherwise have had to return as CEO through their blatant fraud, Defendants were emboldened.

207.    Despite their apparent belief, neither Mr. Aselage nor Ms. Valeur-Jensen ever explained to Mr. Shkreli in February 2015 that there was no discussion to be had about his pre-termination options because the options had all expired. This is because they knew that if they did, Retrophin would not be able to unload assets that were of no value to it to Turing.

208.    They also knew that Mr. Shkreli would have started a proxy fight or filed suits against them for fraud as he would have realized then he was defrauded.

209.    Either option for Mr. Shkreli would have resulted in Defendants' ending up on the losing side.  A proxy fight, for instance, would have given Mr. Shkreli control over the Board, meaning Defendants would be removed from the company immediately.

210.    Ms. Valeur-Jensen and Mr. Aselage concealed their view that Mr. Shkreli would receive no options, either pre- or post-termination, under the SSP, and strong-armed Mr. Shkreli and Turing into closing on asset purchase agreements for assets that were of no value to Retrophin.

211.    To that end, Ms. Valeur-Jensen gave a multitude of excuses, including that a definitive agreement with Mr. Shkreli could not be completed at the same time as the asset transfers because it required the Compensation Committee and they could "not be available on no notice."

212.    Ms. Valeur-Jensen even went so far as to lie and say that "Retrophin w[ould] move forward in good faith on the basis of the Summary Separation Agreement and will comply with the terms thereof provided [the asset purchase agreements] close today." Under no set of facts could this statement, which was made on February 9, 2015, be true. And, Retrophin never entertained a definitive agreement with Mr. Shkreli.

213.    Further, Ms. Valeur-Jensen and Defendants had already acted in bad faith in connection with the SSP by materially altering the version for signature and not notifying Mr. Shkreli of such. As such, any representation that the SSP was going to be performed in good faith was a lie.

214.    Mr. Shkreli, on behalf of Turing, would not have closed on the asset purchase agreements with Novartis and Manchester had he known that Retrophin, at the direction of Defendants, would deny him all his options, as contemplated under the SSP, and accuse him publicly of wrongdoing just days later. Rather, Mr. Shkreli would have filed a lawsuit just as he threatened, but for Defendants' fraudulent inducement in October 2014.

215.    The behind-the-scenes communications between Defendants also evidence their fraud. On February 8, 2015, just days before the asset purchase agreements between Retrophin and Turing were finalized, Mr. Aselage and Mr. Lyons were secretly discussing how Mr. Aselage had no intention of negotiating a definitive agreement with Mr. Shkreli.

Mr. Aselage apparently believed that because of Defendants' fraud, they could be rid of Mr. Shkreli.

216.    On February 12 and 13, 2015, the asset purchase agreements with Novartis and Manchester closed. Mr. Shkreli held up his end of the deal under the SSP. Retrophin did not.

217.    After Retrophin received everything it wanted and needed under the SSP (e.g., Mr. Shkreli's resignation as CEO and a director, and millions of dollars for assets it was not using), Retrophin, at Defendants' direction, took the position to Mr. Shkreli that the SSP was not binding, even after Mr. Aselage told Mr. Shkreli it was. Retrophin, at Defendants' instruction, thereafter refused to enter into a definitive agreement with Mr. Shkreli.

### February 19, 2015: Retrophin's Newly Appointed Oversight Committee, Led by Gary Lyons, Files a Form 8-K with the SEC Disclosing its Purported Findings of an Internal Investigation into Mr. Shkreli

218.    Uncoincidentally, just a few days after the asset purchases between Retrophin and Turing closed, on February 19, 2015, Retrophin filed a Form 8-K with the SEC, publicly disclosing its investigation into Mr. Shkreli, and its "findings." Defendants never told Mr. Shkreli about the extensive investigation or the findings that the company intended to publicly disclose while Mr. Shkreli and Retrophin were supposed to be acting in good faith to negotiate a definitive agreement, as called for by the SSP. Mr. Shkreli only learned of them after they were made public.

219.    The February 19, 2015 8-K undermined any notion to the public that Mr. Shkreli resigned for good cause.

42

220.    As the Form 8-K states, in January 2015, Retrophin's Board (the one that ousted Shkreli) appointed an Oversight Committee with the "independent" and plenary authority to oversee and direct an internal investigation into Mr. Shkreli and to make findings and decisions relating to the investigation. Mr. Lyons, one of two members of the Oversight Committee, was anything but independent and neutral.

221.    To the contrary, Mr. Lyons hated Mr. Shkreli and was not afraid to share his feelings about Mr. Shkreli with other Defendants.

222.    Mr. Aselage and Ms. Valeur-Jensen knew Mr. Lyons hated Mr. Shkreli. So did they. So did Mr. Richardson.  As stated below, Mr. Lyons's hatred towards Mr. Shkreli had nothing to do with Retrophin.  In any event, despite Mr. Lyons's strong personal animus towards Mr. Shkreli, Defendants agreed it was appropriate for Mr. Lyons to oversee the "independent" investigation into Mr. Shkreli. Mr. Richardson did too.

223.    During the internal investigation, Mr. Lyons admitted to a then Retrophin employee that he hated Mr. Shkreli because Mr. Shkreli shorted Avanir's stock (and publicly boasted about it).  Avanir was a company whose board Mr. Lyons sat on at the time and remained on during the internal investigation. Mr. Shkreli also shorted the stock of Neurocrine, a company that Mr. Lyons founded and served as CEO of during Mr. Shkreli's shorting.

224.    With such a strong personal animus against Mr. Shkreli, Mr. Lyons had an unavoidable conflict and should not have been given the authority to oversee an "independent" investigation into Mr. Shkreli. Retrophin's giving Mr. Lyons the ultimate

authority to make alleged "independent" findings and decisions related to the internal investigation into Mr. Shkreli undermined any legitimacy of the internal investigation.

## February 24, 2015: Retrophin Terminates the Separation Agreement with its Former CFO, Mr. Panoff

225.    As further evidence that Retrophin, at the instruction of Defendants and the Oversight Committee, led by Mr. Lyons, never intended to honor the terms of the SSP, it terminated its Separation Agreement dated September 15, 2014 with Marc Panoff, the former CFO, "for cause" just four days before the parties' separation date of February 28, 2015.

226.    This was less than two weeks after the asset purchase agreements between Retrophin and Turing were executed, and only five days after Retrophin filed the 8-K disclosing its purported findings from the internal investigation.

227.    Defendants knew that Retrophin would be filing the 8-K and terminating Mr. Panoff's separation agreement so that he would not receive severance when they strong-armed Mr. Shkreli into closing on the asset purchase agreements.

228.    The termination of Mr. Panoff's separation agreement is further evidence of why Ms. Valeur-Jensen and Mr. Aselage were entirely unwilling to provide any clarity on the treatment of Mr. Shkreli's options or a definitive agreement despite repeated requests that month. If the company was not going to honor Mr. Panoff's separation agreement, it surely was not going to honor any agreement it had with Mr. Shkreli.

## March 2015 – August 2015: Retrophin, at the Direction of Defendants, Continues to Refuse to Honor the SSP

229.    In April 2015, Mr. Shkreli attempted to enter into a definitive agreement with Retrophin. Retrophin, at the direction of Defendants, refused, even though investors and shareholders were asking them to put the dispute with Mr. Shkreli to rest.

230.    In May 2015, Mr. Shkreli attempted to exercise his pre-termination options and two tranches of options that vested, as contemplated by the SSP, after he was terminated.

231.    Retrophin, at the direction of Defendants, refused to allow Mr. Shkreli to exercise his options. Thus, Retrophin, at the direction of Defendants, succeeded in committing fraud by having Mr. Shkreli sign a materially altered document that did not reflect the parties' negotiations and agreement, and by fraudulently inducing Mr. Shkreli to resign as CEO of the company for no consideration.

232.    In August 2015, despite internally contemplating filing an arbitration against Mr. Shkreli, as Mr. Shkreli's Employment Agreement included a broad arbitration clause, Retrophin, in an obvious effort to make a public statement against Mr. Shkreli, filed a detailed complaint against Mr. Shkreli blaming Mr. Shkreli for all the Board's failures and shortcomings and claimed Mr. Shkreli owed the company $65 million in damages.

233.    While this amount is grossly overstated, it is also based on the stock price on August 17, 2015, which was $30.78. Today, Retrophin's stock is worth much less and has hovered around $18.00 for the last year. Further, many of the transactions at issue in the

complaint are from 2012 (when Retrophin's stock was hardly worth anything) and the first half of 2013 when the stock was trading between $3 and $8.

234.   Retrophin's complaint, combined with Defendants' and Retrophin's significant cooperation with the FBI and USAO, greatly contributed to trumped-up criminal charges being filed against Mr. Shkreli relating to Retrophin which were tacked on to criminal charges relating to his hedge fund. These allegations, spoon-fed to the government by Retrophin, were reflected in Count 7 of both an indictment and superseding indictment wherein the government described a conspiracy to commit wire fraud against Retrophin. Mr. Shkreli was acquitted of Count 7.

### 2015 – 2019: Mr. Aselage and Ms. Valeur-Jensen Receive Millions from Retrophin

235.   After Mr. Shkreli was ousted, Mr. Aselage and Ms. Valeur-Jensen immediately rewarded themselves.

236.   Immediately after ousting Mr. Shkreli, Mr. Aselage received a new employment agreement for his tenure as CEO under which he received a base salary of $480,000 -- $180,000 higher than what Mr. Shkreli received for the same role. Mr. Aselage's base salary was later increased to $560,000.

237.   Under Ms. Valeur-Jensen's Employment Agreement with Retrophin, she received an annual base salary of $425,000 per year, plus a discretionary targeted bonus of 50% of her base salary. Ms. Valeur-Jensen also received a restricted stock unit covering 100,000 shares of the Company's common stock, which vested on November 1, 2015. At

that time, these shares were worth $2,100,000. At the peak stock prices, these shares were worth more than $3 million.

238. Ms. Valeur-Jensen was able to secure such a lucrative employment agreement with the help of Mr. Aselage, the CEO, after originally rejecting Mr. Aselage's offer as too low.

239. On February 1, 2016, a little more than a year after assuming the General Counsel role, Ms. Valeur-Jensen entered into a Retirement and Transition Agreement with Retrophin, under which she received another 50,000 shares of Retrophin's common stock vested as of December 31, 2016. As of the date of vesting, the value of this stock award was $946,500. It was odd for Ms. Valeur-Jensen to receive such generosity after only being with the company for 1.5 years. Retrophin, under Mr. Aselage, certainly did not show other employees this same generosity, including Mr. Shkreli and Mr. Panoff.

240. In just a few years, Ms. Valeur-Jensen was paid millions of dollars. She received over $5 million, to be more precise.

241. Although she had complained about how much Retrophin paid its outside counsel, Katten Muchin, Ms. Valeur-Jensen received more than $5 million in compensation for a year of service as General Counsel of a start-up company.

242. Ms. Valeur-Jensen believed that due to their seniority, she and Mr. Aselage were entitled to receive such lucrative salaries. She did not believe the same was true for younger professionals, no matter how profitable or productive they were.

243. In fact, Ms. Valeur-Jensen and Mr. Aselage frequently and derogatorily referred to younger professionals at Retrophin as "college kids" or just "kids."

47

244.    This was particularly true with the employees who worked in Retrophin's Business Development group, which was largely comprised of talents hired by Mr. Shkreli (even though Mr. Aselage oversaw the department). Mr. Aselage and Ms. Valeur-Jensen resented that Mr. Shkreli wanted to reward his employees for hard work that would make the company millions, if not more.

245.    For example, Ms. Valeur-Jensen was outraged that Retrophin's business development employees received a salary of $85,000 per year. Mr. Shkreli believed in rewarding his employees, particularly those who added value to the company. In contrast to Ms. Valeur-Jensen and Mr. Aselage, Mr. Shkreli personally, out of his own money, gave his secretary a $100,000 bonus. Mr. Shkreli also extended similar generosity from his own money to other employees.

246.    During his tenure as CEO, Mr. Aselage received salary, bonus, stock, and options valued at approximately $30 million.

247.    For serving as a director, Mr. Lyons received over $1 million.

248.    Mr. Richardson received $400,000 for serving as a director for 1.5 years. This amount is about 10 times greater than the amount a director of a comparable size company would have received.

249.    The harvest reaped by Defendants was created almost entirely by the seeds planted and sowed by Mr. Shkreli and his colleagues in 2011 through 2014.

**2015 – 2019: Shkreli's Efforts Lead to Continued Success for Retrophin**

250.    Despite Mr. Shkreli's unlawful ousting and Defendants' fraud, Mr. Shkreli's legacy at Retrophin remained strong. And still does. Almost everything Retrophin is and has is because of Mr. Shkreli.

251.    Today, Retrophin has three marketed products, the same number as when Mr. Shkreli was ousted. Two of Retrophin's marked products, Thiola® and Chenodal®, were acquired by Retrophin while Mr. Shkreli was CEO. The other product, Cholbam®, was identified by Mr. Shkreli and in the works when he was ousted.

252.    Two of Retrophin's three late stage (Phase 3) assets include Sparsentan (for the treatment of FSGS) and RE-024 (for the treatment of PKAN). As set forth above, RE-024 is Mr. Shkreli's invention and Retrophin's acquisition of Sparsentan in early 2012 was the result of Mr. Shkreli's research. The success of these two drugs for Retrophin is due to Mr. Shkreli.

253.    The success of Sparsentan has been tremendous. In January 2015, just months after Shkreli's ousting, Retrophin received orphan drug designation from the FDA for Sparsentan for the treatment of FSGS.

254.    In November 2015, the European Commission (EC) granted Sparsentan orphan drug designation for the treatment of FSGS.

255.    In September 2016, Retrophin announced that the phase II trial of Sparsentan, designed by Mr. Shkreli and Dr. Trachtman, rendered positive results and had met its primary objective. The 109-patient DUET trial proved that Sparsentan reduces levels of protein in the urine, a biomarker for kidney damage, more effectively than the

control drug, irbesartan. Patients given Sparsentan experienced a statistically significant 44.8% larger drop in proteinuria (excess serum protein in the urine) whereas patients given irbesartan only saw an 18.5% decline.

256.    In the second quarter of 2018, Retrophin began a pivotal Phase III test of Sparsentan for the treatment of FSGS. If successful, this study will serve as the basis for accelerated approval of Sparsentan and will make it the first FDA-approved pharmacologic treatment option for patients with FSGS.

257.    In the fourth quarter of 2018, Retrophin announced positive long-term data from the open-label extension of the Phase II DUET study of Sparsentan for the treatment of FSGS.

258.    The Chief Medical Officer of Retrophin stated that "the DUET Study continues to provide compelling data that suggests sparsentan has the potential to provide long-term nephroprotective benefits for people living with FSGS."

259.    Retrophin also began a Phase III clinical trial with Sparsentan in IgA nephropathy (IgAN), a second indication for the drug, in the fourth quarter of 2018. If successful, this study will serve as a basis for filing for accelerated approval of Sparsentan in the United States, and an application for Conditional Marketing Authorization (CMA) in Europe.

260.    Like Sparsentan, RE-024 has also been successful. In May 2015, Retrophin received FDA Orphan Drug Designation for RE-024 for the treatment of PKAN. In June 2015, the FDA granted Fast Track designation for RE-024. In March 2016, Retrophin announced new data supporting further clinical development of RE-024, showing that the

drug was safe and well-tolerated in healthy volunteers and showed sustained clinical benefit over 12 months. In September 2016, the European Union (EU) granted orphan drug designation to RE-024. In July 2017, Retrophin dosed its first patient in a Phase III trial of RE-024.

261.   At the end of 2018, Retrophin completed patient enrollment in the pivotal Phase III Fosmetpantotenate Replacement Therapy (FORT) Study for PKAN patients.  The FORT Study is being conducted under a Special Protocol Assessment (SPA) Agreement with the FDA, who has agreed that the design of the trial will be adequate to support an NDA if the data from the trial are positive.

262.   Patients enrolled in the clinical trials for PKAN since 2013 are still alive six years later. They would not be without RE-024.

263.   Even after Mr. Shkreli's ouster, at the hands of Defendants, Retrophin is still viable because of Mr. Shkreli's hard work. Defendants were handsomely rewarded with millions of dollars which would not have been possible but for Mr. Shkreli. In return, Mr. Shkreli suffered significant damage because of Defendants' fraud and was denied the consideration owed to him by Retrophin. Surely, this was not the Retrophin Mr. Richardson had dreamed of.

264.   Rather, the Retrophin Mr. Richardson dreamed of was one that could bring new drugs to the market that cure rare diseases. This was Mr. Shkreli's Retrophin. Because of Mr. Shkreli, it is likely that both RE-021 and RE-024 will go on to help people suffering from FSGS and PKAN as they already have. This was Mr. Richardson's dream, and Mr. Shkreli's.

265.    Defendants' conduct amounts to self-dealing as the ouster did not benefit Retrophin.  Rather, the ouster only benefited Defendants.  Had Mr. Shkreli remained with the company, Retrophin would have been better off than it is today.  In plotting and carrying out their scheme to oust Mr. Shkreli, Defendants only thought about their pockets while ignoring the interest of the company.

### COUNT I – FRAUD (Fraudulent Inducement)
### (Shkreli v. Aselage)

266.    The allegations set forth in the above paragraphs are incorporated herein by reference as if fully set forth herein.

267.    Mr. Aselage, by acts of omission, concealment, non-disclosure and misrepresentations, made materially false statements of fact to Mr. Shkreli about Retrophin's willingness to honor the terms of the SSP, including entering into a definitive agreement(s) with Mr. Shkreli, and allowing him to receive continued vesting of his options for one year.

268.    At all relevant times, Mr. Aselage controlled Retrophin and knew that he was not going to allow the company to honor its promises under the SSP and that Mr. Shkreli would be resigning "voluntarily" for no consideration.

269.    As evidence of Mr. Aselage's fraud, Mr. Aselage refused to have the company enter into a definitive agreement with Mr. Shkreli in February 2015 and refused to provide Mr. Shkreli with clarity on the terms of the SSP and his options, despite repeated requests.

270.    Rather, Mr. Aselage hid from Mr. Shkreli that the company was going to argue Mr. Shkreli was not entitled to any options, either pre- or post-termination, for if he had, he knew that the asset purchases between Retrophin and Turing, as contemplated in the SSP, would not be consummated.

271.    Mr. Aselage knew at the time the statements were made to Mr. Shkreli that the statements were false. These statements were made by Mr. Aselage with knowledge of their falsity and with the intent of misleading Mr. Shkreli into relying on them.

272.    Mr. Aselage intended for Mr. Shkreli to be fraudulently induced into action by relying upon the statements of fact made to him by Mr. Aselage. Mr. Aselage also knew, however, he was never going to have Retrophin satisfy the obligations he represented to Mr. Shkreli Retrophin would satisfy under the SSP.

273.    In executing the SSP, Mr. Shkreli reasonably and justifiably relied on the statements of fact made to him by Mr. Aselage to his detriment.

274.    But for these representations by Mr. Aselage, Mr. Shkreli would never have entered into the SSP, which resulted in him resigning for no consideration.

275.    But for these representations by Mr. Aselage, Mr. Shkreli would have taken steps to enforce his rights under the Employment Agreement immediately.

276.    But for these representations by Mr. Aselage, Mr. Shkreli would have taken steps to start a proxy fight and remove Mr. Aselage and Mr. Lyons from the Board and terminate Ms. Valeur-Jensen from the company.

277.    As a direct and proximate result of Mr. Shkreli's reliance on the statements made to him by Mr. Aselage, Mr. Shkreli has suffered significant damage.

278.   The amount of damages to Mr. Shkreli exceeds $30 million, including the amount of compensation due under the Employment Agreement and other compensation he would have received.

279.   Mr. Aselage's actions were for his own benefit and in conscious disregard of a substantial risk of harm to either Mr. Shkreli or the company.

280.   The foregoing acts of Mr. Aselage were done intentionally, wantonly, willfully, and maliciously, warranting the imposition of punitive damages.

WHEREFORE, Mr. Shkreli, demands entry of a judgment in his favor and against Mr. Aselage for an amount to be determined at trial, including an award of compensatory damages, punitive damages, pre- and post-judgment interests, costs, and such other relief as this Court deems just and appropriate under the circumstances.

### COUNT II – FRAUD (Fraud in the Factum)
### (Shkreli v. Aselage)

281.   The allegations set forth in the above paragraphs are incorporated herein by reference as if fully set forth herein.

282.   Between the time Mr. Shkreli was unlawfully terminated as CEO from Retrophin and October 12, 2014, Mr. Shkreli and Mr. Aselage exchanged several drafts of the SSP, outlining proposed terms of Mr. Shkreli's separation from the company.

283.   After the parties agreed to the material terms of the SSP, on October 13, 2014, Mr. Aselage sent an email at 3:31 p.m. that stated: "Attached is the LOI. Board has approved it. I don't think there are any surprises but take a look. If you're good with it,

please sign and pdf it back. We'll sign and get moving on finalizing a press release." Mr. Aselage attached a final, clean copy of the SSP that did not reflect any redline changes.

284.    While representing that there are no "surprises" in the SSP, Mr. Aselage did not explain what changes he made to the SSP.

285.    And Mr. Shkreli, believing the SSP was the same as or substantially similar to the one he and Mr. Aselage negotiated and agreed to, without consulting with his lawyers, sent the signed SSP back one hour later.

286.    In fact, however, the SSP that Mr. Aselage told Mr. Shkreli was as Mr. Shkreli and Mr. Aselage agreed to was materially altered.

287.    Notably, and unbeknownst to Mr. Shkreli, Mr. Aselage altered the first paragraph of the SSP to make the SSP *binding* only as to Mr. Shkreli's voluntary resignation.  In other words, Mr. Aselage altered the SSP so that, while the rest of the SSP is non-binding, including any of the company's obligations, Mr. Shkreli's voluntary resignation was made binding.

288.    Mr. Aselage's email communication to Mr. Shkreli did not reflect this material change that is underlined and bolded above.  Rather, Mr. Aselage led Mr. Shkreli to believe the SSP he sent to Mr. Shkreli was the same or a substantially similar version to the one Mr. Aselage and Mr. Shkreli shared right before the altered version.

289.    Mr. Shkreli, believing that Mr. Aselage would negotiate in good faith, did not believe Mr. Aselage would dupe him. As such, Mr. Shkreli signed this version of the SSP without even sending it to his lawyers first, believing there were no material changes, as Mr. Aselage had represented.

290.    Having worked with Mr. Shkreli for a few years, Mr. Aselage knew Mr. Shkreli was a trusting person who would rely on his (Mr. Aselage's) representation that the SSP was the same or substantially similar as the one the parties already approved.

291.    Mr. Aselage successfully duped Mr. Shkreli and had Mr. Shkreli sign the fraudulent SSP.

292.    But for the false representations by Mr. Aselage, Mr. Shkreli would never have entered into the SSP, which resulted in him resigning for no consideration.

293.    As a direct and proximate result of Mr. Shkreli's reliance on the statements made to him by Mr. Aselage, Mr. Shkreli has suffered significant damage.

294.    The amount of damages to Mr. Shkreli exceeds $30 million, including the amount of compensation due under the Employment Agreement and other compensation he would have received.

295.    Mr. Aselage's actions were for his benefit and in conscious disregard of a substantial risk of harm to either Mr. Shkreli or the company.

296.    The foregoing acts of Mr. Aselage were done intentionally, wantonly, willfully, and maliciously, warranting the imposition of punitive damages.

WHEREFORE, Mr. Shkreli, demands entry of a judgment in his favor and against Mr. Aselage for an amount to be determined at trial, including an award of compensatory damages, punitive damages, pre- and post-judgment interests, costs, and such other relief as this Court deems just and appropriate under the circumstances.

## COUNT III – AIDING AND ABETTING FRAUD
### (Shkreli v. Lyons and Valeur-Jensen)

297.     The allegations set forth in the above paragraphs are incorporated herein by reference as if fully set forth herein.

298.     Mr. Aselage perpetrated fraud on Mr. Shkreli by the acts of omission, concealment, non-disclosure and misrepresentations, falsely representing that the company would honor the terms of the SSP, including entering into a definitive agreement(s) with Mr. Shkreli and allowing him to receive continued vesting of his options for one year.

299.     At all times, as material participants in Mr. Aselage's scheme, both Mr. Lyons and Ms. Valeur-Jensen knew that Mr. Aselage would not let the company honor its representations under the SSP and that Mr. Shkreli would be resigning for no consideration.

300.     Mr. Lyons and Ms. Valeur-Jensen also knew about the method or scheme in which Mr. Aselage would carry out the fraud.

301.     Despite their knowledge of fraud, Mr. Lyons and Ms. Valeur-Jensen engaged in conduct that aided and provided substantial assistance to the scheme to defraud.

302.     Mr. Lyons and Ms. Valeur-Jensen assisted by, among others, advising Mr. Aselage about the scheme, encouraging Mr. Shkreli to enter into the SSP, misleading Mr. Shkreli about his options under the Employment Agreement, and concealing Mr. Aselage's true intention of not honoring the SSP.

303.     As a direct and proximate result of Mr. Lyons's and Ms. Valeur-Jensen's conduct, Mr. Shkreli has suffered significant damage.

304.   The amount of damages to Mr. Shkreli exceeds $30 million, including the amount of compensation due under the Employment Agreement and other compensation he would have received.

305.   The foregoing acts of Mr. Lyons and Ms. Valeur-Jensen were done intentionally, wantonly, willfully, and maliciously, warranting the imposition of punitive damages.

WHEREFORE, Mr. Shkreli, demands entry of a judgment in his favor and against Mr. Lyons and Ms. Valeur-Jensen, jointly and severally, for an amount to be determined at trial, including an award of compensatory damages, punitive damages, pre- and post-judgment interests, costs, and such other relief as this Court deems just and appropriate under the circumstances.

## COUNT IV – AIDING AND ABETTING FRAUD
### (Shkreli v. Valeur-Jensen)

306.   The allegations set forth in the above paragraphs are incorporated herein by reference as if fully set forth herein.

307.   Mr. Aselage perpetrated fraud on Mr. Shkreli by duping Mr. Shkreli to sign the SSP that included a materially different term (i.e., the fraudulent term that said a voluntary resignation being binding) than the version the parties approved.

308.   Ms. Valeur-Jensen knew about the SSP containing the materially different term that Mr. Shkreli never approved.

309.   Ms. Valeur-Jensen, as the lawyer drafting the SSP, induced a material error in the SSP, which is an ethical violation in California (where she is licensed).

310.    Ms. Valeur-Jensen knew as she was the person who prepared the SSP and the fraudulent term Mr. Shkreli never approved.

311.    Ms. Valeur-Jensen engaged in conduct that aided and provided substantial assistance to the scheme to defraud.

312.    Ms. Valeur-Jensen assisted the fraud in the factum by, among others, advising Mr. Aselage about the fraud and drafting the fraudulent language in the SSP.

313.    As a direct and proximate result of Ms. Valeur-Jensen's conduct, Mr. Shkreli has suffered significant damage.

314.    The amount of damages to Mr. Shkreli exceeds $30 million, including the amount of compensation due under the Employment Agreement and other compensation he would have received.

315.    The foregoing acts of Ms. Valeur-Jensen were done intentionally, wantonly, willfully, and maliciously, warranting the imposition of punitive damages.

WHEREFORE, Mr. Shkreli, demands entry of a judgment in his favor and against Ms. Valeur-Jensen for an amount to be determined at trial, including an award of compensatory damages, punitive damages, pre- and post-judgment interests, costs, and such other relief as this Court deems just and appropriate under the circumstances.

## COUNT V – AIDING AND ABETTING FRAUD
### (Shkreli v. Aselage, Lyons, and Valeur-Jensen)

316.    The allegations set forth in the above paragraphs are incorporated herein by reference as if fully set forth herein.

317.    Under the direction and control of Mr. Aselage, Retrophin perpetrated fraud on Mr. Shkreli by the acts of omission, concealment, non-disclosure and misrepresentations, falsely representing that Retrophin would honor the terms of the SSP, including entering into a definitive agreement(s) with Mr. Shkreli, and allowing him to receive continued vesting of his options for one year.

318.    At all times, Defendants, as Retrophin's agents, knew that Retrophin did not intend to honor its representations under the SSP and that Mr. Shkreli would be resigning for no consideration.

319.    Defendants also knew about the method or scheme in which Retrophin would carry out the fraud.

320.    Despite their knowledge of fraud, Defendants engaged in conduct that aided and provided substantial assistance to the scheme to defraud.

321.    Defendants assisted by, among others, encouraging Mr. Shkreli to refrain from filing lawsuits against the company or starting a proxy fight, encouraging Mr. Shkreli to enter into the SSP, misleading Mr. Shkreli about his options under the Employment Agreement, and concealing Retrophin's true intention of not honoring the SSP.

322.    As a direct and proximate result of Defendants' conduct, Mr. Shkreli has suffered significant damage.

323.    The amount of damages to Mr. Shkreli exceeds $30 million, including the amount of compensation due under the Employment Agreement and other compensation he would have received.

324.    The foregoing acts of Defendants were done intentionally, wantonly, willfully, and maliciously, warranting the imposition of punitive damages.

WHEREFORE, Mr. Shkreli, demands entry of a judgment in his favor and against Defendants Mr. Aselage, Mr. Lyons, and Ms. Valeur-Jensen, jointly and severally, for an amount to be determined at trial, including an award of compensatory damages, punitive damages, pre- and post-judgment interests, costs, and such other relief as this Court deems just and appropriate under the circumstances.

### COUNT VI – AIDING AND ABETTING FRAUD
### (Shkreli v. Aselage and Valeur-Jensen)

325.    The allegations set forth in the above paragraphs are incorporated herein by reference as if fully set forth herein.

326.    Under the direction and control of Mr. Aselage, Retrophin perpetrated fraud on Mr. Shkreli duping Mr. Shkreli to sign the SSP containing the fraudulent term that Mr. Shkreli never approved.

327.    At all times, Mr. Aselage and Ms. Valeur-Jensen, as Retrophin's agents, knew that Retrophin defrauded Mr. Shkreli by having Mr. Shkreli sign the SSP containing the fraudulent term that Mr. Shkreli never approved.

328.    Despite their knowledge of fraud, Mr. Aselage and Ms. Valeur-Jensen engaged in conduct that aided and provided substantial assistance to the scheme to defraud.

329.    Mr. Aselage and Ms. Valeur-Jensen assisted the fraud in the factum by, among others, scheming the fraud, sending the SSP with the fraudulent term to Mr. Shkreli, and drafting the fraudulent language in the SSP.

330.   As a direct and proximate result of Mr. Aselage's and Ms. Valeur-Jensen's conduct, Mr. Shkreli has suffered significant damage.

331.   The amount of damages to Mr. Shkreli exceeds $30 million, including the amount of compensation due under the Employment Agreement and other compensation he would have received.

332.   The foregoing acts of Mr. Aselage and Ms. Valeur-Jensen were done intentionally, wantonly, willfully, and maliciously, warranting the imposition of punitive damages.

WHEREFORE, Mr. Shkreli demands entry of a judgment in his favor and against Defendants Mr. Aselage and Ms. Valeur-Jensen, jointly and severally, for an amount to be determined at trial, including an award of compensatory damages, punitive damages, pre- and post-judgment interests, costs, and such other relief as this Court deems just and appropriate under the circumstances.

Respectfully submitted,

**KANG HAGGERTY & FETBROYT LLC**

By:   _s/ Edward T. Kang_
      Edward T. Kang
      Gregory H. Mathews (*Pro Hac Vice to be filed*)
      Kandis L. Kovalsky (*Pro Hac Vice to be filed*)
      *Attorneys for Plaintiff, Martin Shkreli*

Dated: May 31, 2019

# EXHIBIT A

## Summary Separation Proposal

The following sets forth the principal terms of the proposed separation proposal involving the resignation by Martin Shkreli as an employee and officer and Director of Retrophin, Inc. (the "Term Sheet"). The Parties acknowledge and agree that, except for Mr. Shkreli's resignations as expressly set forth herein (which resignations are binding and irrevocable), this proposal and all discussions in connection herewith are non-binding and there are no legally binding obligations between Retrophin, Inc. and Mr. Shkreli relating to the proposal or the entry into a definitive agreement, whether set out herein or otherwise, setting forth these terms. The terms of this proposal are confidential. The parties will work together in good faith to execute the transactions contemplated by this agreement.

### PARTIES

Retrophin, Inc., a company organized and existing under the laws of Delaware, USA and having its principal office at 777, Third Avenue, 22nd Floor, New York, New York 10017 ("Retrophin")

Martin Shkreli, 245 East 40th Street, 20C, New York, New York 10016 (Mr. Shkreli")

### PROPOSAL SUMMARY

Mr. Shkreli hereby resigns as an employee and officer of Retrophin and from the Board of Directors of Retrophin as set forth below. Retrophin will assign to a company formed by Mr. Shkreli ("NewCo") the Retrophin Vecamyl, oxytocin and ketamine licenses and assets (the "Assigned Programs") on the terms and conditions set forth below.

### EMPLOYMENT AGREEMENT AND DIRECTORSHIP

Mr. Shkreli hereby resigns as an employee or officer of Retrophin for "Good Reason" as set forth in the employment agreement dated December 16, 2013 by and between Mr. Shkreli and Retrophin (the "Employment Agreement"). Mr. Shkreli will receive the severance and other benefits associated with resignation for Good Reason including:

- 12 mos annual base salary, unpaid bonus and health insurance coverage on the same terms as made available to Retrophin employees (Severance Benefits)
- 12 mos of continued vesting of time based stock options (no vesting of performance based stock options)

subject to the conditions for the receipt of those benefits set forth in the Employment Agreement including but not limited to:

- Return of Company property and records
- Non-solicitation provided that this shall be waived with respect to any employees who elect to join NewCo at any time prior to the effective date of the definitive agreement
- Non-competition with Retrophin programs and products as of the date of the definitive agreement and any business development opportunities under consideration by Retrophin as of the date of the definitive agreement (may be listed as Exhibit B)
- Confidentiality
- Arbitration dispute resolution

Mr. Shkreli hereby resigns from the Board of Directors of Retrophin.

Mr. Shkreli will provide the release required by the Employment Agreement.

Retrophin will release Mr. Shkreli from actions taken by Mr. Shkreli between September 30, 2014 and the date of the definitive agreement to (i) enter the Retrophin premises, (ii) access the Retrophin computer systems and (iii) contact Retrophin employees provided (a) that such actions would have been legally taken by Mr. Shkreli if Mr. Shkreli had been the Chief Executive Officer of Retrophin and (b) Mr. Shkreli complies with the conditions for Severance Benefits set forth above. In no event will the foregoing apply to any other actions taken by Mr. Shkreli during this period including but not limited to (i) sales of any Retrophin common stock and any Section 16b short swing requirements, (ii) any contracts entered into or commitments made by Mr. Shkreli on behalf of Retrophin, (iii) the disposition of any Retrophin property or (iv) any other actions taken in the capacity of Chief Executive Officer or Director of Retrophin.

# Summary Separation Proposal

Except as set forth above, neither party will release the other from any actions, causes of action, in law or in equity, suits, debts, liens, liabilities, claims, demands, damages, losses, costs or expenses, of any nature whatsoever, whether known or unknown, fixed or contingent prior to or after the effective date of the definitive agreement.

## MR. SHKRELI'S RTRX COMMON STOCK

Mr. Shkreli will hold at least 75% of the RTRX common stock held by Mr. Shkreli as a result of stock option or restricted stock grants by Retrophin for a period of 12 months.

Mr. Shkreli will vote all shares of common stock of RTRX held by Mr. Shkreli for the management proposals set forth in the Retrophin proxy at any annual or special meeting of Retrophin shareholders for two years following the effective date of the definitive agreement.

Mr. Shkreli will not engage in any proxy or consent solicitation activities, submit any shareholder proposals, or seek to effect an acquisition or other extraordinary transaction with respect to RTRX for two years following the effective date of the definitive agreement.

## ASSIGNMENTS AND LICENSE

| | |
|---|---|
| ATHYRIUM CONSENT | Retrophin agrees to use good faith efforts to seek consent pursuant to the Credit Agreement dated as of June 30, 2014 as amended for the assignments contemplated herein. No assignments will be effective without such consent. |
| VECAMYL LICENSE: | Retrophin agrees to use good faith efforts to assign to NewCo the License and Manufacturing Agreement dated April 4, 2013 between Manchester Pharmaceuticals, Inc. and Nexgen Pharma, Inc., subject to the prior written consent of Nexgen. |
| NOVARTIS LICENSE: | Retrophin agrees to use good faith efforts to assign to NewCo the License Agreement dated December 12, 2013 between Retrophin and Novartis Pharma AG subject to Novartis' prior written consent pursuant to section 19.3 of the agreement. (Novartis Agreement) Whether or not Novartis provides the consent required for Retrophin to assign the Novartis Agreement to NewCo, NewCo will be responsible for and will pay the minimum annual payments required under Section 10.1(b) after the date of this agreement, not to exceed $9MM. |
| KETAMINE LICENSE: | Retrophin agrees to use good faith efforts to assign to NewCo the Exclusive License Agreement dated December 12, 2013 between Retrophin and Stuart Weg, MD subject to Dr. Weg's prior written consent pursuant to section 10 of the agreement. (Weg Agreement) |
| ASSIGNED ASSETS: | Retrophin agrees to assign to NewCo the Assigned Assets. |
| | The Assigned Assets will be those materials, data and information owned or controlled by Retrophin as set forth on Exhibit A. |
| TECH TRANSFER: | All of tech transfer costs relating to transfer of the Assigned Assets will be borne by NewCo. Retrophin personnel devoted to the assistance of tech transfer shall be billed to NewCo at a rate of one hundred thousand dollars ($100,000) per employee full time equivalent. This sum shall not exceed twenty five thousand dollars ($25,000) without prior approval by NewCo. |

# Summary Separation Proposal

NewCo will be responsible for making all necessary arrangements for the physical transfer of the Assigned Assets. Retrophin agrees to facilitate transfer of the Assigned Assets directly to NewCo or to a third party selected by NewCo. NewCo will endeavor to minimize impact on Retrophin resources. Each of NewCo and Retrophin agree to enter into such three-way confidentiality and non-disclosure agreements with third parties as may reasonably be requested by NewCo, Retrophin or a third party to facilitate information exchanges between NewCo and third parties in respect of the Assigned Assets.

Within 30 days from the effective date of the definitive agreement, Retrophin will complete all 3rd party notifications. Within 6 months of the effective date of the Assigned Assets, the tech transfer of Assigned Assets will be completed.

## ECONOMICS

ASSET ASSIGNMENT FEE:

In consideration of the assignments set forth herein to NewCo, NewCo agrees to pay Retrophin a non-refundable, one-time fee of three million dollars ($3,000,000), simultaneously with the consummation of the transfer of the Assigned Assets.

PAYMENTS UNDER ASSIGNED CONTRACTS:

NewCo will be responsible for:
- All payments under the Novartis Agreement including for avoidance of doubt the $3MM payment due as of December 12, 2014 and all future payments.
- All payments under the Weg Agreement, including for avoidance of doubt the $1MM payment due as of December 12, 2014 and all future payments.

## LIABILITIES AND INDEMNIFICATION

ASSIGNED CONTRACTS:

NewCo will indemnify and hold Retrophin harmless for all costs, expenses and liabilities arising after the effective date of the definitive agreement in connection with (i) the Nexgen Agreement, Novartis Agreement and Weg Agreement, (ii) the Assigned Assets, and/or (iii) the making, using or selling of Vecamyl, oxytocin and/or ketamine by NewCo.

Retrophin will indemnify and hold NewCo and Mr. Shkreli harmless for all costs, expenses and liabilities arising prior to the effective date of the definitive agreement in connection with (i) the Nexgen Agreement, Novartis Agreement and Weg Agreement, (ii) the Assigned Assets, and/or (iii) the making, using or selling of Vecamyl, oxytocin and/or ketamine by Retrophin.

## LEGAL PROVISIONS

GOVERNING LAW:          State of New York.

DEFINITIVE AGREEMENT:   To be prepared by counsel to Mr. Shkreli, in form and substance as may be mutually agreed.

PRESS RELEASE:          To be mutually agreed as to both content and timing.

NewCo Confidential

## Summary Separation Proposal

OTHER PROVISIONS:  As may be customary and mutually agreed.

RETROPHIN, INC.

By: _____

Name: Stephen Aselage
Title: Interim Chief Executive Officer

Date: October 13, 2014Agreed and Accepted:

_____

Martin Shkreli
October 13, 2014

NewCo Confidential

# Summary Separation Proposal

**EXHIBIT A**

Vecamyl

    Scientific assessment of alternate indication
    Dear HCP letter to list of former prescribers
    Support for Dr. Fox's case report publication Tourette's syndrome rage
    Supply – inventory (+50K tablets) & raw materials (594g – enough for 2 batches)

Oxytocin

    Market research & Forecast –milk let down
    Synopsis – low birth weight infants
    Synopsis – phase 1 study
    Briefing document & FDA minutes
    Number of investigator proposals for other indications
    500 nasal spray vials of active and 500 nasal spray vials of placebo currently at Kydes
    *In-process DelPharm manufacturing run
    *17,500 nasal spray vials of placebo & in-process run for 17,500 nasal spray vials
    *Order of 28g of raw material –order pending

Ketamine

    Synopsis – Suicidal ideation
    IND & Supporting data – Javelin Pharma.
    2 Briefing document & FDA feedback
    *3 Kg raw material – order pending

All amounts are approximate
* to be paid for by NewCo

**EXHIBIT B**

Theratechnologies Inc.
Asklepion Pharmaceuticals, LLC
Xenbilox (CDCA)
Clinuvel
Neolutions
Stiripentol

NewCo Confidential